**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **LOUIS G. WEAVER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )  **CIVIL ACTION 05-0449-WS-B** |
| | ) |
| **JACK TILLMAN,** *et al.,* | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

This matter is before the Court on defendant Mobile County's Motion for Summary Judgment (doc. 89) and defendant Jack Tillman's Motion for Summary Judgment (doc. 93). Both Motions have been briefed and are ripe for disposition at this time.

**I.    Background.**[1]

*A.    Weaver's Detention, Medical Treatment and Death.*

The summary judgment record is fragmentary, comprised primarily of skimpy and sometimes cryptic jail records rather than witness testimony.  Nonetheless, viewing the evidence in the light most favorable to the plaintiff, the undersigned understands the relevant facts to be as follows:  At 11:30 p.m. on August 4, 2003, 31-year old James Weaver ("Weaver") was booked at the Mobile County Metro Jail (the "Jail") in Mobile, Alabama on charges of Robbery Second, Giving False Name to Officer, and Possession of Controlled Substance.  (Plaintiff's Exh. 3; Tillman Exh. 2.)[2]  A "Jail Receiving Screening Form" completed at the time of Weaver's

---

[1]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1217 (11th Cir. 2005).  Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in his favor.

[2]    Weaver had a history of significant medical problems predating his arrest.  In particular, his father testified that Weaver "had a severe case of hepatitis C," that he "had a sta[ph] infection in the past," that he had had gall bladder surgery and had been hospitalized for several days thereafter with an infection.  (L. Weaver Dep., at 30-31.)  Weaver's mother

booking reflected that he was conscious; that he did not have obvious pain, bleeding or other symptoms suggesting a need for emergency treatment; and that there were no visible signs of trauma or illness requiring immediate medical attention. (Plaintiff's Exh. 3.)[3] That document also stated that Weaver displayed bruises on his forehead, cheeks and eyes. (*Id.*) Booking photographs confirm the bruising to Weaver's face, including visible swelling around his left eye. (Plaintiff's Exh. 4.) The intake form, which Weaver signed, stated that he had no current illness, was taking no medication, and had no special health requirements. (Plaintiff's Exh. 3.) That document also characterized Weaver as friendly, alert and cooperative. (*Id.*)[4]

At the time of Weaver's arrival, a Jail nurse examined him and completed a "Medical Encounter Record" noting Weaver's explanation for his physical appearance that a "bounty hunter beat him up." (Plaintiff's Exh. 8.) The nurse observed that Weaver had a black eye, that he was talking constantly, that he was able to stand, that he was alert and oriented, and that he smelled of alcohol. (*Id.*) Based on this examination, the nurse noted on the form, "Bring to clinic after dressed out" and "MD visit ASAP," apparently for treatment of his facial cuts and bruises rather than for any more serious symptoms (which Weaver had not disclosed at intake). (*Id.*) Another pre-printed Medical Encounter Record form in the record is blank except for a solitary handwritten notation, as follows: "8/4/03 Refused to see MD R. St_____l." That

---

indicated that he had hepatitis C and cirrhosis of the liver, and that he had previously been hospitalized with a bone infection and gall bladder problems. (Chestang Dep., at 19-20.)

[3]    This exhibit is a copy of a form, which plaintiff submitted on summary judgment without authentication or verification. Generally, courts ruling on Rule 56 motions may consider only admissible evidence or evidence that could be presented in an admissible form. *See, e.g., Denney v. City of Albany,* 247 F.3d 1172, 1189 n.10 (11th Cir. 2001). Documents must generally be properly authenticated to be considered at summary judgment, unless it is apparent that they can be reduced to admissible, authenticated form at trial. *See Bozeman v. Orum,* 199 F. Supp.2d 1216, 1222 (M.D. Ala. 2002). Those requirements were not followed as to this exhibit, or many others in the record. Nonetheless, there appears to be no dispute that this exhibit is in fact a true and accurate copy of the Jail form, and as there has been no motion to strike any exhibits, the Court will consider this and other unauthenticated, unverified exhibits on the assumption that they can be reduced to admissible, authenticated form at trial.

[4]    It is undisputed that Weaver was a drug addict at the time of his arrest, with a longstanding history of intravenous drug abuse. (L. Weaver Dep., at 17; Tillman Exh. 10.)

notation is signed "D. King RN 8/5/03."  (Plaintiff's Exh. 9.)[5]

Weaver was housed in Pod 402.  Sick call was conducted in that pod each morning from August 5 through August 9.  (Tillman Exh. 1.)  Jail log books and other records do not reflect that Weaver ever availed himself of sick call or that he otherwise requested or received medical treatment from August 5 through August 8.  Plaintiff offers no evidence that he did so, nor is there any showing that Jail personnel obstructed or discouraged Weaver from requesting medical treatment during daily sick call or at any other time.[6]  On the morning of the 9th, however, Cpl.

---

[5]      Plaintiff argues that the form signed by Nurse King is "unreliable."  In doing so, plaintiff offers no affirmative evidence to contradict that form, but instead discounts it because the form is not completed in its entirety, does not mention Weaver by name, and includes two different dates.  (Plaintiff's Brief (doc. 101), at 2 n.1.)  Further, plaintiff insists that Plaintiff's Exhibit 9 is undermined by the Jail's clinic log book for the night of August 4 to August 5, which makes no mention of Weaver being brought to the clinic or refusing treatment.  (*Id.*)  This basis for circumventing Plaintiff's Exhibit 9 is not compelling for several reasons.  First, plaintiff assumes that Weaver's rejection of medical treatment occurred after he was brought to the Jail clinic, but there is no indication in the record of same.  If Weaver refused treatment before going to the clinic, then one would hardly expect a clinic log book to report an event that never occurred there.  Second, even if Weaver went to the clinic before refusing treatment, plaintiff's argument fails because there is no evidence that a clinic log entry of an inmate refusing treatment was required or even standard practice under Jail policies or operating procedures, particularly if record of such refusal was made on another form.  There is no indication in the record that plaintiff queried Tillman or other jail officials as to the significance (if any) of the absence of that kind of entry in the clinic log book.  Nor is there any indication that plaintiff sought to depose either Nurse King or the physician on duty to question them about these events or log book practices.  Nor does the record show that plaintiff has obtained the original of the form (the lower portion of which appears to have been truncated in the copy in the record) to see if it identifies Weaver by name.  Rather than conducting discovery and presenting evidence as to the legitimacy of the form, plaintiff decries it using speculation and innuendo.  Also unavailing is plaintiff's contention as to Exhibit 9 that "there is just no meaning as to what this could possibly mean."  (Plaintiff's Brief, at 5 n.6.)  The wording of Exhibit 9 is clear and unambiguous, so the Court cannot endorse plaintiff's attempts to minimize that document as vague or inscrutable.

[6]      The Amended Complaint alleges that Weaver "complained constantly of external and internal pain to ... the booking jailers, medical personnel and each and every jailer inspector that inspected his jail cell."  (Amended Complaint, ¶ 12.)  Inasmuch as plaintiff has proffered no record evidence to support that allegation, the Court cannot credit it on summary judgment.  Similarly, the Court does not accept the unsupported allegation in the Amended Complaint that Weaver told his father "that he asked to be taken to the doctor and they wouldn't."  (*Id.*, ¶ 13.)  The same applies to allegations in the Amended Complaint about what Weaver's cell mate,

Henderson (who conducted sick call) brought Weaver to the Jail clinic at 8:22 a.m., shortly after sick call.  (*Id.*)[7]  Ten minutes later, a nurse examined Weaver and reported that he was "complaining of chills, fever, dizziness and weakness."  (*Id.*)[8]  He was promptly transported to the USA Medical Center ("USA") in Mobile for treatment.  (*Id.*)  Weaver never returned to the Jail.

USA records show that Weaver was admitted to the hospital at 3:00 p.m. on August 9, 2003, with fever and thrombocytopenia.  (Plaintiff's Exh. 1.)  Dimitris K. Kyriazis, MD FACS, one of his attending physicians, opined that "Weaver had a serious medical condition" at the time of his admission because "he was septic," meaning that "his entire body system was infected."  (Dr. Kyriazis Aff., at 2.)  According to Dr. Kyriazis, this condition was pre-existing when Weaver arrived at the Jail on August 4, 2003.  (*Id.*)  At USA, Weaver was diagnosed with septic endocarditis and a staph infection in his bloodstream.  (Tillman Exh. 10.)  He received antibiotic therapy from August 9 through August 15, and underwent open-heart surgery for a mitral valve replacement on August 15.  (*Id.*)  After that surgery, Weaver developed complications.  He went into cardiac arrest and was pronounced dead at 8:10 a.m. on August 16, 2003.  (*Id.*)  The Alabama Department of Forensic Sciences performed an autopsy that same morning, identifying the cause of death as "hemothorax due to post-operative hemorrhage," with "liver cirrhosis" as a contributory cause.  (Tillman Exh. 8.)

Dr. Kyriazis, who attended Weaver's mitral valve replacement surgery, has submitted an

---

whose testimony is not part of the record, may have said to anyone at any time regarding these events.  (*Id.*, ¶ 17.)

[7]     Although it is undisputed that Jail personnel took Weaver to the clinic after sick call on August 9, this event is recorded in the clinic log book but not in the pod log book.  (*See* Tillman Exh. 1.)  The absence of such an entry from the pod log book underscores the fact that Jail personnel did not slavishly record every happening for every inmate in redundant records.  This omission further undermines plaintiff's contention that the absence of an entry on Weaver in the clinic log book for the night of August 4 must mean that he never refused medical treatment at that time, notwithstanding the existence of written Jail records to the contrary.

[8]     Amongst the documents in the record is a report referencing a Medical Encounter Record dated August 9, 2006 at 8:30 a.m. and purportedly including a statement from Weaver that "I feel real bad."  (Tillman Exh. 2.)  However, that Medical Encounter Record was omitted from the summary judgment record and therefore cannot be considered.

affidavit offering the following expert opinions: (a) Weaver had a serious medical condition on August 4, 2003, when he was admitted to the Jail; (b) "it is very likely" that prompt treatment after Weaver's admission to the Jail "would have lessened [his] serious medical condition"; and (c) "it is most likely" that prompt medical treatment would have lessened the serious medical condition that Weaver displayed on August 6 and 7 at the Jail. (Plaintiff Exh. 1.) This evidence reflects that Weaver died not because of a health condition that he contracted at the Jail, but because of a condition he already had when he first arrived at the Jail.

> **B.**    ***Weaver's Parents' Interactions with Weaver and Jail Staff.***

Having reconstructed this chronology largely from documents in the record, the Court now turns to the testimony of Weaver's parents as to their interactions with him during the last 12 days of his life, as well as their efforts to intercede with Jail officials on his behalf.

At 1:20 a.m. on August 5, 2003, plaintiff Louis G. Weaver was sitting home watching television when the telephone rang. The caller was plaintiff's son, Weaver, who indicated that he had been arrested and was at the Jail. (L. Weaver Dep., at 13-14.)[9] He was apparently calling from the Jail's docket room. Weaver told his father that he was very sick because he had been beaten by bounty hunters, and that he needed a doctor. (*Id.* at 15.) There is no evidence that Weaver complained of any health problems in that call other than the scrapes and bruises inflicted by the bounty hunters. Weaver asked his father to bring money so that he could visit the doctor. (*Id.* at 16.) Louis Weaver knew that his son had been in jail several times before, and had been informed by his son in the past of a Jail policy that there was a $10 charge for inmates to see a doctor. (*Id.* at 16, 18-19.) The next morning, plaintiff brought $10 to the Jail and gave it to a "sheriff's representative," non-party Shandura LeDaux, so that Weaver could

---

[9]    Louis Weaver testified that he received this telephone call "Monday morning of the 4th at 1:20 in the morning, a.m." (L. Weaver Dep., at 13-14.) There is apparently no dispute, however, that Weaver was not arrested until the night of August 4, 2003, meaning that the call to his father must have been placed at 1:20 a.m. on August 5, not August 4. (*See* Plaintiff's Brief (doc. 101), at 1.) Likewise obviously incorrect is plaintiff's counsel's repeated assertion that August 4, 2003 fell on a Sunday. (*Id.* at 1 and 2 n.2.) It was actually a Monday, although that distinction is not material for purposes of this Order.

have medical treatment.  (*Id.* at 19, 36.)[10]  At that time, plaintiff informed LeDaux that (a) Weaver was very sick, (b) Weaver had hepatitis C, (c) Weaver had previously suffered from staph infection, and (d) plaintiff "would like to see the sheriff or somebody and see about getting him some help."  (*Id.* at 36.)  LeDaux responded that "she would talk to her supervisor and make sure that he got some help."  (*Id.* at 37.)[11]  The $10 was promptly credited to Weaver's inmate account.

On Thursday, August 7, 2003, Louis Weaver received a tearful telephone call from his ex-wife, Nancy Chestang, who had just visited Weaver at the Jail.  (L. Weaver Dep., at 41.) When Weaver walked into the room, Chastang "almost didn't know who he was, because he looked so bad. ... His color was gray.  He just had no color in his face or in his arms or anything."  (Chestang Dep., at 13.)  She testified that he had ruptured blood vessels in both eyes, that the side of his face "was all red and purple," that his eyes "were all black and green," and that one hand was swollen.  (*Id.*)  Weaver terminated his visit with his mother after just 10 minutes because he said he needed to lie down.  (*Id.* at 14.)  According to Chestang, Weaver told her that he was sick and said, "I can't see the doctor because I don't have enough money in my account."  (*Id.*)[12]  He also requested that Chestang call plaintiff to bring "some more money" to enable him to see a doctor and obtain medicine.  (*Id.* at 13.)  Chestang conveyed this request to Louis Weaver.  (*Id.* at 14-15.)  In response, plaintiff brought a money order for $25 to the Jail

---

[10]     Louis Weaver was familiar with this procedure because he had previously engaged in similar activities on his son's behalf.  Specifically, in connection with Weaver's arrests prior to August 2003, plaintiff had had occasion to bring $10 to the Jail administration office and tell them that his son was sick and needed a doctor.  (L. Weaver Dep., at 21-23.) Louis Weaver testified that he had not asked Jail personnel whether his son would be allowed to see a doctor without that $10 payment, and that he did not know whether a $10 payment was a necessary precondition to any doctor visit.  (*Id.* at 23-24.)

[11]     In her deposition, LeDaux testified that she did just that.  In particular, she indicated that after Louis Weaver came to the administration office with concerns about Weaver's health, she passed along the message to the warden and also contacted the Jail clinic. (LeDaux Dep., at 10-12.)  LeDaux has no knowledge of what, if anything, was done in response to these concerns.  (*Id.* at 12.)

[12]     It is undisputed, however, that Weaver had $10 in his inmate account at the time of Chestang's visit, and that the maximum co-pay for a doctor visit at the Jail was also $10.

administration office that very day and presented it to LeDaux.  (L. Weaver Dep., at 42;
Chestang Dep., at 11-12.)[13]  At that time, plaintiff asked LeDaux why his son had not seen a
doctor and indicated that "the sheriff or somebody" needed to get Weaver to a doctor.  (L.
Weaver Dep., at 42.)  LeDaux's response was, "I'll handle it, I'll handle it."  (*Id.*)  Weaver's
parents had no further substantive contact with Jail officials prior to his death.[14]

      Plaintiff seeks to hold defendant Tillman responsible for Weaver's death because Tillman
"didn't carry him to the doctor."  (L. Weaver Dep., at 79.)  At all relevant times, Tillman was the
Sheriff of Mobile County.  (Tillman Dep., at 6.)  Among Tillman's duties as Sheriff was the
responsibility to maintain and operate the Mobile Metro Jail.  (*Id.*)[15]  It is undisputed that
Tillman was not personally familiar with, and had no personal participation in, Weaver's
booking, intake and treatment at the Jail from August 4, 2003 through August 9, 2003.  (*Id.* at 7.)

### C.     *Jail Policies Regarding Medical Treatment.*

      In operating the Jail, Tillman implemented Standing Operating Procedures ("SOPs") for
both sheriff's deputies and jail corrections officers.  (Tillman Dep., at 6-7.)  As of 2003, he
testified, there was a SOP concerning the provision of medical attention for prisoners at the Jail.
(*Id.* at 9-10.)  Tillman testified that Jail intake employees "do the best they can" to screen

---

[13]     At plaintiff's request, Jail staff eventually returned the $25 to him.  (L. Weaver
Dep., at 46.)  Louis Weaver never inquired as to whether any of those funds were used for
Weaver's medical needs.  (*Id.*)  Also, there is a non-material discrepancy as to the exact dates
and amounts of funds brought to the Jail by Louis Weaver.  Jail records reflect that plaintiff
brought $10 to the Jail on his son's behalf on August 6, and $15 on August 8 (Plaintiff's Exh.
11); meanwhile, plaintiff testified that he had brought $10 to the Jail on August 4, and $25 on
August 7.  These inconsistencies are not germane to the summary judgment analysis.

[14]     According to plaintiff, Jail staff never informed him that Weaver had been sent to
USA until August 14, when Louis Weaver went to the Jail for a visit.  (L. Weaver Dep., at 50-
51.)  At that time, LeDaux arranged for plaintiff to visit Weaver in the hospital that day, which
he did.  (*Id.* at 51-52.)  Chestang saw Weaver at the hospital on the morning of his surgery.
(Chestang Dep., at 15.)

[15]     This testimony is corroborated by the Affidavit of John Pafenbach (doc. 92),
County Administrator for Mobile County, which states that the Sheriff of Mobile County sets
policies for and operates the Jail, and that the Mobile County Commission does not in any way
oversee, direct or control the Jail or the Sheriff's operation or policies of same.  (Pafenbach Aff.,
¶¶ 2-3.)

inmates to determine if "there's something wrong with the prisoner" at the time of intake, but that such efforts are hampered by the practical reality that 4,000 people per month are booked at the Jail.  (*Id.* at 10-11.)

As of August 2003, the Jail had several SOPs bearing on inmate medical treatment.  The first was entitled "Admission and Booking" and concerned screening of inmates at intake.  (Tillman Exh. 3.)  That SOP required Intake Receiving Officers to inspect arrestees for apparent injuries or impairments and, if injuries are observed, notify Jail medical staff.  (*Id.*)  If medical staff determined that immediate medical treatment was needed, then the arrestee would not be admitted to the Jail, but would instead be returned to the arresting officer pending receipt of a medical clearance certificate from off-site medical providers.  (*Id.*)  A second SOP, labeled "Receiving Screening / Health Assessments," required that if an arrestee showed visible signs of injury or complained of pain at intake, a Jail nurse would assess the inmate's condition at the intake area to determine whether booking should proceed or whether the inmate should be taken to a hospital for treatment and returned to the Jail upon receipt of written medical clearance.  (Tillman Exh. 4.)  That same SOP required nurses to collect and review all Jail Receiving Screening Forms twice during each shift for arrestees who may need immediate medical care, and to ensure that such care is provided.  (*Id.*)  That SOP further required that a "health assessment" for each inmate be completed by a nurse within 14 days after arrival at the Jail.  (*Id.*)  This health assessment includes checking the inmate's vital signs, listening to the inmate's chest and back via stethoscope, completing a medical questionnaire, and answering any questions that the inmate might have.  (*Id.*)  The SOP allowed inmates to refuse medical evaluation.  (*Id.*)

The third SOP set forth the Jail procedures for sick calls.  Each morning a medical officer distributes Health Services Request forms to inmates who request to see a nurse.  Those forms are collected and delivered to the Director of Nursing for evaluation and prioritization.  Inmates who request medical attention are sent to the nurse's station, where they are examined and receive appropriate treatment.  (Tillman Exh. 5.)  If the nurse determines that an inmate requires a physician's care, the inmate will be scheduled to be seen during the next scheduled physician's visit.  (*Id.*)  By the terms of the SOP, inmates are charged a fee of $10 for non-emergency sick call visits.  (*Id.*)  Nonetheless, the SOP clearly provided that "Medical care for inmates ***shall***

-8-

***never be refused***.  Inmates without funds to cover medical charges will have a negative balance entered into their account."  (*Id.*)  Moreover, under no circumstances are inmates charged for sick call visits relating to a medical emergency.  (*Id.*)

Fourth and finally, a Jail SOP designated "Emergency Medical Response" stated that if either an inmate notifies an officer of an illness or an officer observes a perceived medical problem for an inmate, Jail medical staff will be notified.  (Tillman Exh. 6.)  The Jail medical staff has the option of requesting to see the inmate right away or arranging for the inmate to be seen at the next sick call.  (*Id.*)  "If the inmate refuses medical treatment, the Security Supervisor will be notified and the incident will be noted in the Pod Log."  (*Id.*)

There is no suggestion in the record that the Jail did not adhere to any of these SOPs as of August 2003, or that its actual practices and procedures deviated materially from those specified in the SOPs.  All record evidence is consistent with these SOPs.

### D.     Procedural Posture.

In an Amended Complaint (doc. 78), plaintiff Louis Weaver, as father and administrator of the estate of James Weaver, brought claims against Tillman, Mobile County, James Bonding Company, and 52 other defendants (most of whom were present or former Jail employees).  On April 13, 2006, after the close of discovery, plaintiff moved to dismiss without prejudice his claims against the 52 other defendants pursuant to Rule 41(a)(2), Fed.R.Civ.P.  (Doc. 85.)  That motion was granted via Order (doc. 100) dated April 24, 2006, leaving Tillman, Mobile County, and James Bonding Company as the only remaining defendants.  Tillman and Mobile County have moved for entry of summary judgment.[16]

---

[16]     Defendant James Bonding Company ("James") has not filed a Rule 56 motion, but instead attempted to proceed *pro se*.  When the Court became aware of James' *pro se* status, an Order (doc. 107) was entered on June 13, 2006, explaining that business entities are not eligible to represent themselves in federal court.  In response to that Order, attorney Thomas Brian Walsh appeared as counsel of record for James on June 22, 2006.  (*See* doc. 109.)  At the final pretrial conference, the Court will explore with counsel for plaintiff and James whether the claims against that entity are properly litigated in this forum.  Specifically, plaintiff's claims against James (all of which concern the alleged beating of Weaver preceding his booking at the Jail) rest on an entirely different factual predicate than those against Tillman and the County (all of which concern Weaver's medical treatment, or lack thereof,  at the Jail, for health conditions unrelated to the alleged beating).  And plaintiff's § 1983 claims against James are problematic,

The Amended Complaint alleges that Tillman and the Jail staff "had a Constitutional duty under the Fourteenth Amendment to provide necessary medical treatment for the injuries of James Weaver that he presented to the jail upon his arrival after his beating" by bounty hunters, and that they further had a Fourteenth Amendment duty not to delay such treatment. (Amended Complaint, ¶ 11.) The crux of plaintiff's claims is that "defendants violated [Weaver's] constitutional right to be given for [*sic*] free health care while a prisoner at the metro jail," proximately causing his death. (*Id.*, ¶ 19.) The Amended Complaint includes three claims for relief against the movants, as follows: (i) a claim that Tillman directly participated in a pattern of neglect, mistreatment and abuse of Weaver by showing deliberate indifference to his medical needs and failing to arrange for treatment (First Claim for Relief); (ii) a claim that Tillman and Mobile County had a policy that inmates would not receive medical treatment if they arrived at the Jail with serious injuries, if they complained of severe injury, or if they failed to pay money toward the cost of their medical treatment (Second Claim for Relief); and (iii) a claim that Tillman failed to properly train, manage, supervise and instruct Jail staff and that he also failed to operate the Jail in accordance with the SOPs relating to the provision of necessary medical treatment for serious medical needs (Fourth Claim for Relief).[17]

## II.  Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact

---

as it seems improbable that James was "a willful participant in joint action with the State or its agents" as is necessary for that entity to be acting under color of state law under § 1983. *See Harvey v. Harvey*, 949 F.2d 1127, 1133 (11ᵗʰ Cir. 1992). Thus, it may be that plaintiff's claims against James sound exclusively in state law and involve facts that are disconnected from plaintiff's claims against Tillman and the County, such that federal jurisdiction is questionable. Counsel for James and plaintiff should be prepared to discuss these issues at the pretrial conference.

[17]     The Amended Complaint also contains a multi-faceted cause of action (the Third Claim for Relief) against defendant James Bonding Company citing use of excessive force in violation of the Fourth Amendment, assault and battery, and wrongful death. (Amended Complaint, ¶ 29.) Setting aside the propriety of a plaintiff packing multiple legal theories and causes of action into a single claim for relief, the Court need not address the Third Claim for Relief, inasmuch as it does not state a claim against Tillman or Mobile County, and James Bonding Company has not filed a Rule 56 motion.

and the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."   *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).   However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment.  *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004).

**III.    Analysis.**

As mentioned *supra*, both Mobile County and Tillman have moved for summary judgment.  Because their motions rest on different legal grounds, each will be addressed separately.

### A.    *Mobile County's Motion for Summary Judgment.*

Mobile County's Motion relies on a straightforward premise that it cannot be responsible under § 1983 for any constitutional violation relating to Tillman's operation and administration of the Jail.  Case law vindicates Mobile County's position.  In *Turquitt v. Jefferson County, Ala.*, 137 F.3d 1285 (11th Cir. 1998), the administratrix of an inmate who was fatally injured in a fight at the Jefferson County Jail filed suit against the county under § 1983, alleging violations of the decedent's constitutional rights in the operation and management of the jail.  After a searching review of Alabama statutory and case law, the Eleventh Circuit, sitting *en banc*, held that an Alabama county cannot be held liable under § 1983 for injuries befalling a county jail inmate arising from the sheriff's management of the jail.  *Id.* at 1286-90.  As the *Turquitt* Court

-11-

explained, Alabama law imposes no duties on counties with respect to daily operation of county jails or supervision of inmates; rather, Alabama counties' duties regarding their jails "are limited to funding the operations of the jail and to providing facilities to house the jail."  *Id.* at 1289 (citation omitted); *see also Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1027 (11ᵗʰ Cir. 2001) ("Alabama counties have no responsibility for daily operation of county jails and no authority to dictate how jails are run").  Alabama law requires the sheriff to ensure that inmates do not come to harm (Ala. Code § 14-6-1), and "an Alabama sheriff acts exclusively for the state rather than for the county in operating a county jail."  *Turquitt*, 137 F.3d at 1288.

In the wake of *Turquitt*, federal courts have uniformly rejected claims against Alabama counties alleging that an inmate sustained harm because of jail operations, management, policies or procedures.  *See, e.g., Marsh*, 268 F.3d at 1026 n.6 (declaring that Alabama county is not liable for deliberate indifference to inmate's medical needs because "under Alabama law the County is not responsible for assuring procedures are in place for inmates to get medical care"); *Gaines v. Choctaw County Com'n*, 242 F. Supp.2d 1153, 1162 (S.D. Ala. 2003) ("While the County does have a duty to maintain its jail, that duty does not extend to the medical care of prisoners."); *Vinson v. Clarke County, Ala.*, 10 F. Supp.2d 1282, 1295-96 (S.D. Ala. 1998) (county could not be liable for sheriff's failure to train jailer, inasmuch as sheriffs possess only state policymaking authority in running day-to-day affairs of jail).

Faced with this daunting wall of precedent, plaintiff criticizes the reasoning of the *Turquitt* line of authorities as immunizing counties from liability for the actions of their sheriffs because "the county sheriff is not the county sheriff, even though it is the county sheriff." (Plaintiff's Brief (doc. 104), at 2-3.)  Nonetheless, plaintiff concedes that *Turquitt* is controlling precedent and that "[t]he current state of the law is against the plaintiff."  (*Id.* at 1, 3.)

The Court finds, pursuant to *Turquitt* and its progeny, that Mobile County cannot be held liable under § 1983 for plaintiff's Second Claim for Relief, which alleges that the Jail had an inadequate policy for providing necessary medical treatment to inmates.  As plaintiff acknowledges, binding precedent holds that an Alabama county is not responsible for ensuring that suitable procedures are in place for jail detainees to receive medical care.  Accordingly, plaintiff cannot pursue his Second Claim for Relief against Mobile County.  Because the Amended Complaint does not purport to assert any other causes of action against the County,

and because plaintiff does not suggest in his opposition brief that he has any other claims against the County that might survive a *Turquitt* analysis, the Court finds that Mobile County's Motion for Summary Judgment is due to be, and the same hereby is, **granted**.

> **B.      Tillman's Motion for Summary Judgment.**

While the Amended Complaint purports to bring several § 1983 claims against Tillman, all are predicated on the notion that Weaver's constitutional rights were violated by the provision of inadequate medical care while he was at the Jail.  This basic argument is packaged in three different ways, to-wit: (i) that Tillman and Jail staff were deliberately indifferent to Weaver's medical needs, (ii) that Tillman had a policy of failing or refusing to provide necessary medical treatment to inmates in Weaver's condition, and (iii) that Tillman failed to provide proper training to Jail staff and failed to enforce the Jail's SOPs concerning the provision of medical treatment to inmates.

> **1.      Deliberate Indifference Standard.**

All of plaintiff's constitutional claims against Tillman may be assessed under the Eighth Amendment's prohibition of cruel and unusual punishment.[18]  The law is clear that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment."  *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (citations omitted); *see also Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999) ("The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs.").  But not every claim that a prisoner has received inadequate medical treatment automatically vaults to the level of a constitutional deprivation actionable under § 1983.  *See, e.g., Farrow v.*

---

[18]      As a technical matter, government officials' treatment of pretrial detainees is governed by the Due Process Clause of the Fourteenth Amendment, while treatment of convicted prisoners is governed by the Eighth Amendment.  *See Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997).  The appropriate legal standards for provision of medical care are the same under both amendments; therefore, Eighth and Fourteenth Amendment cases can be used interchangeably in the "deliberate indifference" analysis.  *See id.*; *Cottone v. Jenne*, 326 F.3d 1352, 356 n.4 (11th Cir. 2003) ("the standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments") (citation omitted).

-13-

*West*, 320 F.3d 1235, 1243 (11th Cir. 2003). To demonstrate that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective standard and a subjective standard. The objective showing contemplates that a plaintiff must establish an "objectively serious medical need," which is defined as "one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" and one which "if left unattended, poses a substantial risk of serious harm." *Brown*, 387 F.3d at 1351 (citations omitted).

The presence of an objectively serious medical need, without more, is not sufficient to create a constitutional violation; rather, the plaintiff must also prove the subjective element "that the prison official acted with deliberate indifference to that need." *Brown*, 387 F.3d at 1351 (citation omitted). A prison official cannot be deemed deliberately indifferent under the Eighth Amendment "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). That requirement has been construed by the Eleventh Circuit as mandating proof of each of the following three facts: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." *Brown*, 387 F.3d at 1351; *see also McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). The "subjective knowledge" prong means that "liability may be imposed for deliberate indifference only if the plaintiff proves the defendant actually knew of an excessive risk to inmate health or safety .... Proof that the defendant should have perceived the risk, but did not, is insufficient." *Campbell*, 169 F.3d at 1364 (citation omitted). That said, a plaintiff need not prove knowledge by direct evidence, but may rely on circumstantial evidence. *See Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1426 (11th Cir. 1997) (opining that defendants' knowledge of plaintiff's medical needs "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence"). In the absence of at least circumstantial evidence of a government official's actual, subjective awareness of the medical need, summary judgment must be granted for that official on the deliberate indifference claim. *See Campbell*, 169 F.3d at 1364.

The "more than mere negligence" component has been deemed satisfied in the following

-14-

categories of circumstances: (a) where an official knows that an inmate is in serious need of medical care, but fails or refuses to obtain treatment for that inmate; (b) where an official unreasonably delays treatment of known serious medical needs; (c) where an official provides grossly inadequate care or selects an easier but less efficacious course of treatment; or (d) where an official provides medical care which is so cursory as to amount to no treatment at all, despite an obvious need for treatment. *See McElligott*, 182 F.3d at 1255 (collecting cases).

      2.      *Plaintiff's Evidence Does Not Establish a Constitutional Deprivation.*

Upon reviewing the summary judgment record in the light most favorable to plaintiff, the Court readily concludes that Weaver had an objectively serious medical need when he was admitted to the Jail on August 4, 2003. Plaintiff's evidence, including specifically the Dr. Kyriazis Affidavit, is that as of August 4, he was suffering from hepatitis C, a septic condition and a staph infection that infected his entire body. It cannot reasonably be disputed that these conditions satisfy the objective standard for a "serious medical need," inasmuch as the need for a doctor's attention for such conditions, if known, is obvious and such conditions may pose a substantial risk of serious harm if left unattended. *See, e.g., Brown*, 387 F.3d at 1351 (finding objective prong of test satisfied because hepatitis and HIV plainly meet definitions for objectively serious medical need); *Lancaster*, 116 F.3d at 1425 (finding that alcohol withdrawal is a serious medical need for purposes of deliberate indifference analysis).[19]

Notwithstanding plaintiff's showing of an objectively serious health need, his § 1983 claims against Tillman cannot survive summary judgment because the subjective prong of the deliberate indifference test is insurmountable on these facts. Viewing the record in the light most favorable to plaintiff, there is no evidence that Weaver ever requested medical attention

---

[19]     Defendant's position on this point is somewhat schizophrenic. In his principal brief, Tillman argues that "[t]here is no evidence that Weaver exhibited serious medical needs prior to August 9, 2003." (Tillman Brief (doc. 95), at 10.) This argument confounds the objective and subjective elements by attempting to compress them into a single factor. If he had serious medical needs while at the Jail, then Weaver satisfies the objective prong of the deliberate indifference query, irrespective of whether and when he "exhibited" them. In his reply brief, however, Tillman prudently concedes that "it is apparent that Mr. Weaver ha[d] a serious medical condition, even prior to his admission to the ... Jail." (Reply Brief (doc. 105), at 7.) Thus, Tillman does not appear to contest that the objective portion of the deliberate indifference test is satisfied.

from anyone at the Jail.  Despite access to the full panoply of discovery tools, plaintiff has proffered no affidavit or deposition transcript from a jailer or fellow inmate to suggest that Weaver ever asked to be seen by a doctor or nurse.  In fact, the only evidence in the record is to the contrary.  A document completed by a Jail nurse shortly after Weaver was admitted states that he refused medical care for the cuts and bruises on his face.  (*See* Plaintiff's Exh. 9.)[20]  At the time of intake, Jail officials observed Weaver to be alert, cooperative and friendly; and indicated that Weaver was not in obvious pain, bleeding or showing other symptoms evincing a need for emergency treatment.  (Plaintiff's Exh. 3.)  Moreover, an intake document signed by Weaver suggests that he misled Jail officials at intake by telling them that he had no current illnesses, that he was taking no medication, and that he had no special health requirements, all of which are inconsistent with plaintiff's arguments herein that Weaver was suffering from hepatitis C and staph infection at that time.  (*Id.*)[21]  It is undisputed that sick call was held each morning in

---

[20]    Plaintiff's Brief unleashes a second salvo of arguments that Exhibit 9 should not be credited for Rule 56 purposes.  (Plaintiff's Brief (doc. 101), at 9-10.)  For example, he states that it "hardly seems plausible" that Weaver would reject medical treatment after being admitted to the Jail in the middle of the night and in an apparently intoxicated condition.  The Court finds nothing implausible about it, and declines plaintiff's invitation to speculate about facts outside the record.  Plaintiff also argues that the Exhibit is not credible because if "he was told that he mayo *[sic]* die if he didn't see the doctor, would he really have said no?"  (*Id.* at 10.)  There is zero evidence that at the time of Weaver's intake, Jail officials had any reason to believe that he "may die if he didn't see the doctor," so the premise of this argument is faulty.  Similarly, plaintiff's criticism of Exhibit 9 because it "does not list how acutely serious his past medical problems were" (*id.*) is unavailing because there is no evidence that Weaver ever apprised Jail officials of his past medical problems, much less any legal authority requiring Jail officials to investigate an inmate's denial of current medical problems as a prerequisite to intake.  Perhaps realizing the futility of these arguments and the total lack of record evidence to counter Plaintiff's Exhibit 9, plaintiff allows that Weaver "was brought in to the jail in a drunken condition" and that "in a drunken condition, the decedent may have said he didn't need to see the doctor."  (*Id.*)  Plaintiff having offered no evidence to rebut the statement that Weaver refused treatment on the evening of August 4, the Court will consider that evidence on summary judgment.  Plaintiff cannot create genuine issues of material fact sufficient to defeat Tillman's Rule 56 Motion simply by arguing that he does not believe Plaintiff's Exhibit 9.

[21]    The intake form (Plaintiff's Exh. 3) signed by Weaver and reflecting that he answered "no" when asked about current illnesses, medications and special health needs belies plaintiff's assertion that Weaver "was not screened" at the Jail.  (Plaintiff's Brief, at 17.)  The only evidence before the Court is that he was screened at intake, just as the Jail's SOP requires.

Weaver's pod.  Despite the lack of evidence that Jail staff imposed any obstacles or restrictions on Weaver's ability to participate, there is no indication that Weaver ever signed up for sick call, that he was ever refused permission to go to sick call, or that he otherwise asked any Jail representative to see a doctor at any time during his detention.  Simply put, the record is legally insufficient to support a finding that Jail personnel possessed subjective knowledge that Weaver had a medical condition that placed him at risk of serious harm.  The uncontroverted evidence is that, far from alerting Jail personnel to his serious health needs, Weaver failed to disclose his medical needs to them, denied the existence of such needs when asked, and then refused medical care and failed to sign up for sick call that was made available to him every morning.

At most, plaintiff proffers two bits of evidence that he claims demonstrate the Jail's subjective knowledge of a risk of serious harm.  First, plaintiff points to Louis Weaver's two conversations with LeDoux in the Jail administrator's office on approximately August 5 and August 7.  Louis Weaver testified that he informed LeDoux on both occasions that he believed his son needed to see a doctor.  But Louis Weaver had not seen Weaver following his incarceration on August 4, and had not spoken with Weaver since the latter went to intake.  Plaintiff cites no authority that would require a Jail to initiate an investigation whenever the parent of an adult inmate states a belief (based exclusively on second- or third-hand information) that the inmate needs medical attention, particularly when the inmate himself has denied the existence of medical problems, refused treatment at intake, failed to sign up for daily sick call, and declined to use funds in his inmate account for a doctor's visit.  Thus, Louis Weaver's statements to LeDoux do not provide even circumstantial evidence that Jail staff had subjective knowledge that Weaver had a health problem placing him at risk of serious harm.  Second, plaintiff points to Chestang's testimony about the physical appearance of her son during her brief visit with him on August 7, 2003, which consisted of statements that he was bruised, that his color was gray, that he appeared weak, and that he excused himself after several minutes to lie down.  Again, however, such evidence does not create a genuine issue of fact that Jail personnel had subjective knowledge of a risk of serious harm.  The bruises on Weaver's face, while perhaps unsightly, do not appear to have constituted a serious medical need, and the fact that Weaver's color was off and he wanted to lie down is simply insufficient to provide his jailers with actual knowledge that he had a serious medical condition, particularly when Weaver had

-17-

declined medical care on August 4, had informed Jail staff at intake that he had no current illness and no special health requirements, and had failed to sign up for sick call.[22]

The Eighth Amendment deliberate indifference test does not transform jailers into mind readers or medical experts. *See generally Cagle v. Sutherland*, 334 F.3d 980, 989 (11th Cir. 2003) ("A prison custodian is not the guarantor of a prisoner's safety.") (citation omitted). It does not compel jailers to second-guess an inmate's refusal to accept medical treatment where no serious medical need is known or evident to them.[23] And it does not require jailers to force an inmate to sign up for sick call when he declines to do so for days on end and when they do not know that he is at risk of serious harm. On the record as presently constituted, no reasonable finder of fact could conclude that Jail officials were aware prior to August 9 that Weaver possessed a serious health need that created a substantial risk of serious harm. An inevitable corollary to that determination is that no reasonable finder of fact could find that Jail officials were deliberately indifferent to Weaver's serious medical needs, and no reasonable finder of fact could therefore find a violation of Weaver's Eighth or Fourteenth Amendment rights to medical

---

[22]     As the Court has already noted, there is no testimony from Weaver's fellow inmates or from any correctional officers at the Jail as to what they saw, how he looked, what he said, or what indications they might have been given that Weaver was in need of medical care. In that regard, plaintiff's evidence of deliberate indifference contrasts sharply with that found sufficient to create a jury question in *Lancaster*, 116 F.3d at 1419, wherein there was extensive record evidence from jailers and other inmates regarding the decedent's physical state and actions in the jail during the time period in which the plaintiff maintained that jailers should have been providing medical treatment. Here, however, Weaver's time at the Jail is virtually an evidentiary black hole, save for the very limited insight of his mother's testimony during the few minutes she spent with him on August 7. There is not one iota of testimony or other evidence from anyone as to how Weaver was conducting himself in the jail between August 5 and August 9, and whether cellmates or jailers in his pod had knowledge or reason to believe that he was suffering from a serious medical need.

[23]     The Eleventh Circuit has explained that the genesis of the governmental obligation not to be deliberately indifferent to inmates' serious medical needs lies in the "critical fact" that "the prisoner cannot get his own care, nor can anyone from outside the jail get to him to help him." *Marsh*, 268 F.3d at 1038. Here, however, Jail medical care was made available to Weaver, but he at turns rejected and otherwise failed to avail himself of such care.

care in the Jail.[24]

        3.     *Plaintiff Has Offered No Basis for Holding Tillman Liable for Any Constitutional Deprivation that May Have Occurred.*

Even if plaintiff had come forward with evidence that Weaver suffered a deprivation of his constitutional right to medical care during his incarceration, defendant Tillman would remain entitled to summary judgment because there is no valid basis for assigning liability for any such constitutional deprivation to him.

As Sheriff of Mobile County, Tillman was vested with legal custody and charge of the Jail and its prisoners. *See* Ala. Code § 14-6-1; *see also Turquitt*, 137 F.3d at 1289 ("Under the Alabama Code, the sheriff has control over the inmates of the jail, the employees of the jail, and the jail itself."). However, plaintiff readily acknowledges that Tillman "had no personal knowledge of the medical condition of [Weaver]." (Plaintiff's Brief, at 7 n.8.). The law is crystal clear that a "Sheriff can have no respondeat superior liability for a section 1983 claim." *Marsh*, 268 F.3d at 1035; *see also Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) ("It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Carswell v. Bay County*, 854 F.2d 454, 457 n.3 (11th Cir. 1988) ("Section 1983 will not support a claim based on a respondeat superior theory of liability.") (citation omitted). Nonetheless, personal participation is not an ironclad prerequisite for § 1983 liability; rather, a supervisor can be liable in the absence of personal participation "when there is a causal

---

[24]     *Compare Farrow*, 320 F.3d at 1246-48 (finding issue of fact on deliberate indifference claim where jail doctor knew of plaintiff's pain, weight loss, bleeding gums and soft diet caused by fact that he had only two teeth, and where doctor was aware that without dentures plaintiff would continue to suffer from pain, bleeding gums, weight loss and malnutrition; but affirming grant of summary judgment to nurse where plaintiff submitted no evidence that nurse was subjectively aware of serious risk of harm to inmate); *McElligott*, 182 F.3d at 1256 (actual knowledge threshold satisfied where jury could find that defendants were aware of inmate's tremendous pain and illness at the time of incarceration, based on medical examination of inmate and inmate's "nearly constant complaints about the pain he was having"); *Lancaster*, 116 F.3d at 1426-28 (actual knowledge prong of deliberate indifference analysis was satisfied where jail defendants had been personally advised that inmate was an alcoholic, that he was prone to potentially fatal alcohol withdrawal seizures, that inmate's medical condition was urgent, and that inmate had almost died from previous seizure).

connection between the actions of [the] supervising official and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360; *see also Wilson v. Attaway*, 757 F.2d 1227, 1241 (11th Cir. 1985). The requisite "causal connection" exists where either (a) "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so" or (b) "a supervisor's custom or policy results in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (citations omitted); *see also Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 706 (11th Cir. 1985) (sheriff may be held liable for deliberate indifference to inmate's medical needs if sheriff established policy or custom requiring inmates to seek court orders to obtain medical services, and if such policy or custom played a role in such deprivation). Plaintiff invokes both of these theories in seeking to impute liability to Tillman.[25]

First, plaintiff maintains that Tillman had a "custom or policy" that resulted in deliberate indifference to Weaver's constitutional rights. According to plaintiff, the Jail SOP that inmates must pay $10 before they can be seen by a doctor unfairly, improperly and unlawfully delayed Weaver's medical treatment, thereby creating the requisite causal connection to support § 1983 liability against Tillman. (Plaintiff's Brief, at 12-14.) This argument fails for five reasons. First, it misstates and overlooks the plain language of the SOP, which provides that (a) there is never any charge for emergency doctor visits; and (b) no inmate is ever denied non-emergency medical care for lack of funds, but will instead be given a negative balance in his inmate account. Second, there is no record evidence that Jail personnel have ever deviated from this SOP since its inception in June 2002, or that they ever denied Weaver (or any other inmate) medical treatment for lack of funds. Third, the timing of Weaver's medical care appeared wholly unrelated to his inmate account balance; indeed, Weaver's father had placed $10 in his

---

[25]     Plaintiff seeks to hold Tillman responsible for the alleged deliberate indifference of Jail staff on the following rationales: "constructive knowledge, widespread abuse case and policy case – a faulty screening policy; a faulty pre-payment policy; a faulty working medical delivery service system in place; *actual* knowledge that the medical delivery system was not working properly." (Plaintiff's Brief, at 7 n.8.)

account as early as August 5, yet Weaver did not obtain medical care until August 9.  Whatever the reason for the delay in Weaver's medical care was, there is no evidence that the $10 policy had anything to do with it.  Fourth, the irrelevance of the policy is underscored by the fact that a nurse examined Weaver at intake on August 4, and referred him to a doctor immediately.  There is no evidence that anyone at the Jail ever informed Weaver that medical care/treatment would be delayed until he mustered the requisite $10 or that his scheduled doctor's visit (which he declined) was conditional on his first paying $10.  Fifth, there is no evidence that Weaver ever requested medical treatment at any time while housed at the Jail, so as to trigger the $10 SOP. Given the dearth of evidence that the Jail's $10 doctor visit SOP played a role in the lack of medical care for Weaver, this policy cannot serve as a basis for imputing liability to Tillman.[26]

Second, plaintiff argues that Tillman may be held liable because of a custom or widespread practice of deliberate indifference to the medical needs of Jail inmates.  (Plaintiffs' Brief, at 14-17.)  Case authorities cited by plaintiff establish that § 1983 liability based on custom requires a showing of "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law."  *Griffin v. City of Opa-Locka*, 261 F.3d 1295,1308 (11th Cir. 2001) (citation omitted); *see also Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) (for purposes of § 1983 supervisory liability, a "custom is a practice that is so settled and permanent that it takes on the force of law").  If the express written policy is not itself unconstitutional (as the Jail's SOPs on medical care clearly are not), then considerably more proof than a single incident of unconstitutional activity is sufficient to establish fault on the part of the policy maker and the requisite causal connection between policy maker and deprivation.  *See City of Oklahoma City v.*

---

[26]     In that respect, this case is readily distinguishable from *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700 (11th Cir. 1985), on which plaintiff relies.  In *Ancata*, the plaintiff alleged that a county jail had refused to refer an inmate to a medical specialist absent either a court order or a promise by the inmate (who was indigent) to bear the costs of that evaluation. *Id.* at 702.  The facts in the case at bar have no discernable resemblance to those in *Ancata*. Incidentally, plaintiff in no way advances his cause on page 13 of his brief by ascribing a quotation (which he presents in all italics and characterizes as having been "emphasized" by that court) to the *Ancata* court that appears nowhere in that opinion.  The Court cannot determine the true origin of the language that plaintiff mis-attributes to *Ancata*.

*Tuttle*, 471 U.S. 808, 824, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).[27]

In an effort to meet this burden of establishing a "widespread practice," plaintiff relies solely on the death of another inmate, James Carpenter, at the Jail in July 2000, fully three years before the events at issue here took place.  (Plaintiff's Brief, at 6, 15-17.)  Plaintiff's evidence is that Carpenter's need for psychiatric care was readily apparent to both guards and other inmates, that he never received medical or psychiatric care, that Jail SOPs were not followed, that Carpenter spent much of his 15 days in the Jail naked and shackled, and that he died from fast-acting infectious complications associated with the restraint injuries to his wrists and ankles. (Plaintiff's Exh. 15.)

In the undersigned's opinion, however, the Carpenter incident cannot sustain a finding that a "widespread practice" of deliberate indifference to the medical needs of inmates existed at the Jail in August 2003.  The Weaver and Carpenter episodes bear little similarity.  Unlike Carpenter, Weaver was offered medical care on the night of his admission to the Jail.  Unlike Carpenter, sick call was made available to Weaver every morning at the Jail.  Unlike Carpenter, there is no evidence that guards or other inmates were aware of Weaver's serious medical needs prior to August 9.  Unlike Carpenter, Weaver was never shackled at the Jail and left bound hand and foot, lying naked in excrement for hours on end.  Furthermore, whatever tenuous, superficial parallels might exist between the fact patterns of Carpenter and Weaver are eradicated by the intervening passage of time.  Three years elapsed between Carpenter's arrest and Weaver's arrival at the Jail.  There is no evidence that any Jail staff member was deliberately indifferent to the medical needs of any inmate at the Jail at any time during that three-year interlude.  More importantly, there is substantial evidence that the Jail's operations were revamped and overhauled between July 2000 and August 2003.  Among the modifications to Jail operations

---

[27]    *See also Grech v. Clayton County, Ga.*, 335 F.3d 1326, 1330 n.6 (11th Cir. 2003) ("A single incident would not be so pervasive as to be a custom or practice."); *Young v. City of Augusta, Ga. Through DeVaney*, 59 F.3d 1160, 1169 (11th Cir. 1995) (claim that custom, practice or policy regarding medical care of inmates caused plaintiff's damages "necessarily will mandate proof that the alleged violations were not isolated instances"); *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990) ("deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences").

implemented by Tillman were the following: (a) new SOPs for medical screening and sick call were issued in 2002; (b) a new warden and chief deputy were assigned to the Jail; and (c) beginning in July 2002, Tillman contracted with a third party for provision of professional health care services at the Jail, including a licensed medical doctor to provide medical treatment on-site five days per week for at least four hours per day.[28]   (Tillman's Supplemental Exhibit (doc. 106).)  Under Eleventh Circuit authority, the existence of past constitutional violations at a jail is not a scarlet letter condemning a jail supervisor to automatic § 1983 exposure forevermore on a "widespread practice" theory, when substantial, effective remedial actions have been taken in the interim.  *See Cottone*, 326 F.3d at 1361 (no § 1983 liability for jail supervisors for death of inmate, despite history of widespread unconstitutional conduct at Broward County Jail, where previously-entered consent decree addressed those deficiencies and supervisors had implemented necessary procedures to conform to such consent decree).[29]

    If the Carpenter facts are as shown by plaintiff's evidence, then the Jail's treatment of Carpenter in July 2000 was both deplorable and unconstitutional.  But uncontroverted evidence establishes that Tillman substantially modified the Jail's operations, both in general and specifically with respect to medical care, in the wake of the Carpenter tragedy.  There is not a scrap of evidence of any inmate receiving inadequate medical care at the Jail between July 2000 and August 2003, as these improvements to the Jail's operating procedures were implemented.

---

[28]    In pointing out that Tillman contracted with a third-party provider for medical services, the Court is not suggesting that such an arrangement insulates Tillman from responsibility for providing adequate medical care to inmates.  It plainly does not.  *See, e.g., Ancata*, 769 F.2d at 705 (the duty to provide medical care to incarcerated individuals is not absolved by contracting with a third party to provide such services, and the government remains liable for constitutional deprivations caused by policies or customs of that third party).  What the Court is saying, however, is that this development is one of many that vitiates plaintiff's reliance on circumstances pertaining to Carpenter in 2000 to argue a widespread practice of deliberate indifference at the Jail as of 2003.

[29]    A supervisor cannot be held liable under § 1983 on a deliberate indifference standard for risks of harm to inmates that were not reasonably known or knowable to him.  *See generally Cagle*, 334 F.3d at 988 (Alabama sheriff's policies of having only one on-duty nighttime jailer were not deliberately indifferent to risk of suicide at jail where sheriff had no reason to believe there was strong likelihood of prisoner suicides and jail had no history of suicide).

-23-

Taken in the light most favorable to plaintiff, the record on summary judgment demonstrates that the Jail's SOPs in August 2003 provided for an integrated system of medical screening and availability of on-site medical care for inmates, including questioning incoming inmates about their medical issues or needs, having nurses examine incoming inmates with potential health concerns, conducting sick call every morning, arranging for on-site doctor visits and nurse staffing, and allowing inmates to have doctor visits even if they lacked funds in their inmate account.  There is no indication that these SOPs were not successfully implemented, or that they were not followed in any instances between July 2000 and August 2003.  These circumstances do not evince a policy, custom or widespread practice of deliberate indifference to inmates' medical needs at the Jail as of August 2003, as is necessary to create the requisite causal connection between Tillman and Weaver's purported deprivation.

In short, then, even if plaintiff had presented sufficient evidence to show a deprivation of Weaver's constitutional right to adequate medical care in the Jail, he has proffered no viable factual or legal basis for holding Tillman liable for that deficiency or for finding the violation to be anything other than in isolated incident.  Accordingly, even if it could be concluded that Weaver's constitutional rights were violated, the summary judgment record would not permit a finding that Tillman is legally responsible for such violations.  Summary judgment is appropriate for Tillman on this basis as well.

### 4.      *Other Claims Against Tillman.*

The foregoing analysis addresses exclusively plaintiff's § 1983 claims against Tillman in his individual capacity.  The Amended Complaint does not identify any state law claims against Tillman.  Even if such claims were brought, plaintiff correctly admits that Tillman "is absolutely immune against state law claims." (Plaintiff's Brief, at 18.)  *See Sheth v. Webster*, 145 F.3d 1231, 1236-39 (11th Cir. 1998) (recognizing that "absolute sovereign immunity" is afforded to sheriffs and deputy sheriffs under Alabama law, while lesser state officials are not immune for actions taken in bad faith, maliciously or willfully); *Tinney v. Shores*, 77 F.3d 378, 383 (11th Cir. 1996) ("Under Alabama law, sheriffs and deputy sheriffs, in their official capacities and individually, are absolutely immune from suit when the action is, in effect, one against the state.").  And to the extent that plaintiff purports to bring official-capacity claims against Tillman under § 1983, those claims are not cognizable, as a matter of law, either.  *See, e.g., Robinson v.*

*Georgia Dept. of Transp.*, 966 F.2d 637, 640 (11th Cir. 1992) ("Congress, in passing § 1983, did not intend to override the immunity guaranteed to the states by the Eleventh Amendment"); *Lancaster*, 116 F.3d at 1429 (finding that district court correctly granted sheriff summary judgment on § 1983 official capacity claims because Alabama sheriff is state official protected by Eleventh Amendment immunity); *Browning v. City of Wedowee, Ala.*, 883 F. Supp. 618, 621 (M.D. Ala. 1995) (dismissing § 1983 claims for money damages against sheriff in official capacity pursuant to Eleventh Amendment immunity); *Boshell v. Walker County Sheriff*, 598 So.2d 843, 844 n.2 (Ala. 1992) (explaining that any claim for damages under 42 U.S.C. § 1983 against a sheriff in his official capacity is barred by the Eleventh Amendment).

**IV.   Conclusion.**

For all of the foregoing reasons, it is hereby **ordered** that the Motions for Summary Judgment (docs. 89, 93) are **granted**.  All of plaintiff's claims against defendants Mobile County and Jack Tillman are **dismissed with prejudice**.  A separate Judgment will enter.

The only remaining defendant in this action is James Bonding Company.  This action is presently set for a Final Pretrial Conference on July 17, 2006, with jury trial to follow in August 2006.  As mentioned in footnote 16, *supra*, counsel for plaintiff and James Bonding Company should be prepared to discuss at the pretrial conference whether a federal forum is appropriate for the claims as between those parties, and how this case should proceed, in light of the dismissal of all claims against the County and Tillman.

DONE and ORDERED this 7th day of July, 2006.


s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE