IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LOUIS G. WEAVER, | ) | |
| | ) | **PUBLISH** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 05-0449-WS-B |
| | ) | |
| JAMES BONDING COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

At the final pretrial conference held on July 17, 2006, the undersigned *sua sponte* raised the question of whether plaintiff's federal claims against the lone remaining defendant are cognizable as a matter of law. The Court ordered supplemental briefing on that narrow issue, and has now received and reviewed the parties' memoranda of law on that threshold question. As such, the viability of the federal cause of action, and the jurisdictional status of the state law claims, are now squarely presented for ruling.

**I.     Background.**

   *A.     Procedural Posture.*

Plaintiff Louis G. Weaver brought this action in this District Court on his own behalf and as administrator of the estate of James Ellis Weaver ("Weaver"). The Complaint filed on August 2, 2005 purported to assert claims against defendant James Bonding Company ("James Bonding") under 42 U.S.C. § 1983 for use of excessive force, in violation of the Fourth Amendment, as well as state law claims for assault and battery and wrongful death. (Complaint, ¶ 29.)[1] Plaintiff maintained that agents of James Bonding "did excessively beat and maim" Weaver on the evening of August 4, 2003 during the course of arresting him. (*Id.*, ¶ 5.) According to plaintiff, Weaver "was beaten senseless" by James Bonding and was "continually

---

   [1] Some 54 other defendants were named in the Complaint. Of that number, plaintiff took a voluntary dismissal with respect to 52 defendants, and the undersigned granted summary judgment in favor of defendants Mobile County and Jack Tillman via Order (doc. 115) dated July 7, 2006. James Bonding is the sole remaining defendant.

beaten after he was senseless." (*Id.*) After spending five days in jail, Weaver was transferred to the USA Medical Center, where he was diagnosed with septic endocarditis and a staph infection in his bloodstream. Weaver received antiobiotic therapy for six days, underwent open-heart surgery for mitral valve replacement on August 15, and died the next day of complications from that surgery. Plaintiff's medical expert, Dr. Dimitris K. Kyriazis, who was one of Weaver's attending physicians, opined that Weaver was septic, meaning that his entire body was infected, and that this condition predated his arrival at Mobile Metro Jail on August 4, 2003. Despite Dr. Kyriazis's stated opinion, plaintiff has alleged in the parties' proposed Pretrial Order (the "Pretrial Order") that the beating of Weaver by James Bonding "was a legal contributing cause [to] his death." (Doc. 117, at 1.)

James Bonding failed to move for summary judgment on the § 1983 or the state law claims, most probably because it sought to represent its own interests in this action by proceeding *pro se*. When this Court learned of James Bonding's *pro se* status, an Order (doc. 107) was entered on June 13, 2006 explaining that business entities cannot represent themselves in federal court. In response, counsel of record appeared for James Bonding on June 22, 2006. (*See* doc. 206.) By that time, however, it was far too late in the day for James Bonding to file a Rule 56 motion. After all federal claims against defendants Mobile County and Jack Tillman were dismissed on summary judgment, the Court became concerned that plaintiff's § 1983 theory might not be cognizable against James Bonding because the latter may not have been acting under color of state law. If that were true, then the only remaining causes of action would be state law claims involving non-diverse parties, which would call into question the propriety of federal subject matter jurisdiction. For that reason, the Court directed the parties to submit supplemental briefing on the narrow issue of the viability of plaintiff's § 1983 claim.

   **B.**  *Relevant Facts.*

The parties' supplemental submissions concerning James Bonding's involvement in this matter rely on facts to which the parties agreed in their Pretrial Order; accordingly, the legal validity of the § 1983 claim will be evaluated by reference to those facts. James Bonding is a bonding company that is duly licensed by the State of Alabama. On or about May 24, 2003, James Bonding bonded Weaver out of jail on charges of felony obstruction of justice and possession of a controlled substance. When Weaver failed to appear for a May 27 court date on

those charges, the Mobile County Circuit Court issued a writ for his arrest. At James Bonding's request, that court issued a certified copy of the bond and conferred upon James Bonding the authority under Alabama law to arrest Weaver and to return him to jail.[2] The parties agree that James Bonding searched for Weaver for more than two months until August 4, 2003, when he was finally located at the Cimarron Club with the help of a tipster. It is undisputed that James Bonding arrested Weaver on August 4 pursuant to the bondsman's process and transported him to Mobile Metro Jail, where he was booked and taken into custody.

There are no agreed facts concerning the method and manner in which that arrest was carried out. For purposes of this Order, however, the undersigned will accept plaintiff's description of that event, as set forth in the Complaint and the Pretrial Order. In particular, the Court assumes (without finding) that James Bonding representatives "jumped into [Weaver's] vehicle while he was trying to evade arrest, crashed the vehicle into a wall and then beat him." (Pretrial Order, at 1.)[3] The Court also accepts plaintiff's characterization that agents of James Bonding used their "fists and a mag light and or other instruments" to beat Weaver "senseless" when they arrested him. (Complaint, ¶ 5.) There is no evidence or allegation that law enforcement officers participated in or in any way assisted or joined James Bonding in effecting

---

[2] The source of that authority is Ala. Code § 15-13-117, which provides that a bail bondsman may exonerate himself "by surrendering the defendant to the jail" and that to achieve that objective he "may arrest the defendant on a bondsman's warrant at any place in the state." *Id.* The Court's understanding is that the clerk of the Mobile County Circuit Court issued a bondsman's process to James Bonding upon request pursuant to Ala. Code §§ 15-13-124 through 15-13-128, following Weaver's failure to make a required court appearance. James Bonding's subsequent actions in arresting Weaver on August 4, 2003 were undertaken pursuant to that state court-issued bondsman's process.

[3] This statement is partially corroborated by the Report of Parties' Planning Meeting (doc. 53), wherein James Bonding offered a *pro se* account of Weaver's arrest by James Bonding agents Bobby Varner and Mike Casper. According to this narrative, Weaver attempted to drive away from Varner and Casper with an open car door, prompting a struggle in which Varner and Casper entered and attempted to forcibly stop Weaver's car. (Doc. 53, at 6.) James Bonding asserted that Varner was thrown from the car after the gear shift broke off in his hand, while Casper was dragged down the street trying to handcuff Weaver, and ultimately gained control of the vehicle and drove it into a ditch, at which time Weaver was taken into custody. (*Id.*)

Weaver's arrest. At most, James Bonding's narrative[4] in the Report of Parties' Planning Meeting reflects that after Weaver had been arrested, handcuffed, and secured in the bail bondsman's vehicle, James Bonding contacted the police, who arrived at the scene a short time later to arrest Weaver's girlfriend, who was also present. (*See* doc. 53, at 6.)[5] James Bonding then transported Weaver to Mobile Metro Jail and placed him in the custody of jailers there.

## II.     Analysis.

### A.     *James Bonding Cannot Be Liable under Section 1983.*

#### 1.     *Section 1983 Liability Requires State Action.*

Plaintiff's sole federal claim alleges that James Bonding utilized excessive force to arrest Weaver, violating his Fourth Amendment rights and giving rise to a claim under 42 U.S.C. § 1983. To prevail on a § 1983 cause of action, a plaintiff must show that a wrongful act "(1) was committed by a person acting under color of state law and (2) deprived the complainant of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992). The law is clear that "the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1263, 1277 (11th Cir. 2003) (citation omitted). For a defendant's actions to be under color of state law, such conduct must be "fairly attributable to the State," which in turn requires that "the party charged with the deprivation must be a person who may fairly be said to be a state

---

[4] Plaintiff does not dispute this portion of the James Bonding narrative, and in fact relies on it in his supplemental brief; therefore, it is accepted as true for purposes of this Order.

[5] Varner's narrative states, in pertinent part, as follows: "[Weaver] was placed in the back seat of my vehicle and I called the police to come out and pick up Mr. Weaver's girlfriend, Sherrie Sellers, as she also had active warrants. Ms. Sellers showed up at the scene approximately five minutes after Mr. Weaver was placed in my vehicle. As we waited for the police to show up, the fire department came ... and spoke with everyone at the scene, including Mr. Weaver." (Doc. 53, at 6.) Thus, the uncontroverted evidence is that (1) James Bonding contacted police only after Weaver had been arrested; (2) the purpose of the call to police was not to effect Weaver's arrest, but rather to apprehend Weaver's girlfriend for unrelated reasons; and (3) police did not arrive on the scene until after Weaver had been arrested and the fire department had checked on the medical condition of all participants in the altercation.

actor." *Harvey*, 949 F.2d at 1130 (citation omitted).[6] "Only in rare circumstances can a private party be viewed as a 'State actor' for section 1983 purposes." *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001) (quoting *Harvey*, 949 F.2d at 1130). Indeed, a private entity such as James Bonding can qualify as a "state actor" under § 1983 only if one of the following three tests is satisfied: (a) a "state compulsion test," wherein the state has coerced or significantly encouraged the violative conduct; (b) a "public function test," wherein private parties perform a public function that is traditionally the exclusive prerogative of the state; and (c) a "nexus/joint action test," wherein the state has insinuated itself into a position of interdependence with the private party, such that the state and private party are essentially joint participants in an enterprise. *Rayburn*, 241 F.3d at 1347; *see also Green v. Abony Bail Bond*, 316 F. Supp.2d 1254, 1259-60 (M.D. Fla. 2004). The "state actor" determination must be made on a case-by-case basis. *See Focus*, 344 F.3d at 1277.

        2.       *Tests for State Action Are Not Satisfied Here.*

Plaintiff's supplemental brief (doc. 118) addresses none of the three tests for satisfying the "state actor" requirement. Nonetheless, application of these alternative frameworks to Weaver's circumstances makes it clear that James Bonding was not a state actor.

As for the state compulsion test, there is absolutely no evidence that the State of Alabama has coerced or encouraged bail bondsmen to use excessive force in carrying out arrests, or even

---

[6] In addition to the "state actor" requirement, the "fairly attributable" test also requires a showing that the constitutional wrong is "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Patrick v. Floyd Medical Center*, 201 F.3d 1313, 1315 (11th Cir. 2000) (citation omitted). This prong of the test is plainly satisfied here. After all, James Bonding arrested Weaver pursuant to a bondsman's process issued by an Alabama state court in accordance with an Alabama statute. That bondsman's process specifically conferred upon James Bonding the right, under Alabama law, to arrest Weaver. It was in the course of that arrest that the alleged deprivation occurred; therefore, the alleged deprivation was plainly caused by the exercise of an Alabama-created right or privilege. *See Landry v. A-Able Bonding, Inc.*, 75 F.3d 200, 204 (5th Cir. 2000) (alleged deprivation was caused by exercise of privilege created by state where "Louisiana law allows bail bondsmen to arrest their principals for purposes of returning them to detention facility officers"); *Green v. Abony Bail Bond*, 316 F. Supp.2d 1254, 1259 (M.D. Fla. 2004) (state right or privilege prong satisfied where bail bondsmen's authority to arrest plaintiff was derived from Florida statute). Therefore, the analysis in this case turns on the "state actor" requirement, not the "state right or privilege" element.

that Alabama has coerced or encouraged bail bondsmen to carry out arrests in any manner.  That omission is sufficient to reject state compulsion as a ground for satisfying the "state action" requirement here.  *See McCoy v. Johnson*, 176 F.R.D. 676, 680 (N.D. Ga. 1997) (rejecting state compulsion theory out of hand where plaintiff made no allegations of any state compulsion on defendant).  At most, the record confirms that an Alabama statute authorizes bail bondsmen to arrest fugitives under certain circumstances, and that James Bonding availed itself of those provisions in obtaining permission from an Alabama court to arrest Weaver for bail jumping.  Mere regulation of a private actor does not and cannot amount to state compulsion of that private actor.  *See Rayburn*, 241 F.3d at 1348 ("[T]he mere fact that a State regulates a private party is not sufficient to make that party a State actor."); *White v. Scrivner Corp.*, 594 F.2d 140, 143 (5th Cir. 1979) (mere existence of state statute permitting merchants to detain shoplifters does not compel them to do so or otherwise constitute overt state involvement that might transform merchant's detention of shoplifter into state action).[7]

The public function analysis is a stringent test requiring a showing that private actors have been given powers or are performing functions that are "traditionally the exclusive prerogative of the State."  *Harvey*, 949 F.2d at 1131.  That a private party's powers may be coextensive with those of the state on a particular matter is irrelevant to that inquiry.  *Id.*  Moreover, very few activities are "exclusively reserved to the states."  *Id.* (parenthetically citing as examples that functions of arrest, detention and search are not exclusively reserved to states).  The authority to arrest, and more specifically the authority to arrest bail jumpers, historically has not been exclusively reserved to the states.  *See, e.g., Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1457 (10th Cir. 1995) (citing authority for proposition that private citizens making arrests are not state actors when they do not act in concert with government officials); *McCoy*,

---

[7]     In his supplemental brief, plaintiff suggests that the fact that bail bondsmen are heavily regulated by the State of Alabama is, in and of itself, sufficient to render their actions "fairly attributable to the State" and to transform them into state actors.  (Plaintiff's Supp. Brief (doc. 118), at 2.)  *Rayburn* and *White* underscore the legal flaw in that contention; therefore, the Court will not adopt plaintiff's reasoning on this point.  *See also Green*, 316 F. Supp.2d at 1261-62 (facts that State of Florida qualifies, licenses and appoints bail bondsmen are unavailing for state actor analysis, where such reasoning would otherwise turn lawyers, doctors, private investigators, and others in heavily regulated professions into state actors, as well).

176 F.R.D. at 680 ("the authority to arrest does not appear to be a power that is traditionally the exclusive prerogative of the State"); *Green*, 316 F. Supp.2d at 1260 ("history indicates that bail bonding has never been an exclusive privilege of the sovereign. Rather, since the inception of the American legal system, bail was administered by private citizens and businessmen."). Plaintiff offers no argument or authority to rebut these principles. Accordingly, the undersigned finds that James Bonding is not a state actor under the public function test, either.

To satisfy the nexus/joint action test, "the governmental body and private party must be intertwined in a 'symbiotic relationship.'" *Rayburn*, 241 F.3d at 1348 (citation omitted). Moreover, "the symbiotic relationship must involve the specific conduct of which the plaintiff complains." *Id.* (explaining that even though state regulates foster parents, the symbiotic relationship thereby created does not encourage or sanction child abuse by foster parents, such that foster parent was not state actor because state was not joint venturer in child abuse that underlay the complaint); *see also Patrick v. Floyd Medical Center*, 201 F.3d 1313, 1316 (11th Cir. 2000) ("We hold that, to sustain a § 1983 claim under the nexus/ joint action test, the symbiotic relationship between the public and private entities must involve the alleged constitutional violation."). Again, a state's mere regulation of a private enterprise is not sufficient to satisfy this test. *See Harvey*, 949 F.2d at 1132 (state imposition of licensing and regulation on private entities is not enough to transform such entities into state actors for § 1983 purposes). "[E]ach case must be analyzed on its own facts to determine whether the interdependence between the private and state entities reflects sufficient state involvement to sustain a § 1983 claim." *Patrick*, 201 F.3d at 1315.[8]

Under these authorities, then, plaintiff must show that the State of Alabama and James Bonding were intertwined in a symbiotic relationship as to James Bonding's arrest of bail

---

[8] For example, the Eleventh Circuit has held that the nexus / joint action test is satisfied where the state contractually requires a private actor to take certain actions, such that the private actor is acting in accordance with the governmental directive and is effectively the surrogate for the state, particularly where the state unmistakably directs the private actor to take those particular actions. *See Focus*, 344 F.3d at 1278-79. Absent such clear evidence of the requisite nexus, it is a daunting task for a plaintiff to show that the state and a private actor were engaged in joint action sufficient to trigger state actor liability under § 1983 for the private entity's conduct.

jumpers pursuant to a bondsman's process. Moreover, in order for this test to be satisfied, that symbiotic relationship must extend to the alleged use of excessive force in the arrest of Weaver that lies at the heart of plaintiff's § 1983 claim against James Bonding. No such evidence exists here. After James Bonding obtained bondsman's process from the state court, there was no state involvement or participation of any kind in James Bonding's ongoing efforts to arrest Weaver. There is no evidence that James Bonding coordinated its two-month search for Weaver with law enforcement agencies. Furthermore, in actually carrying out the arrest, James Bonding was unaccompanied by police officers. It appears that no law enforcement agency was even aware that James Bonding was attempting to arrest Weaver at the Cimmaron Club on the evening of August 4 until after that arrest had been consummated and Weaver was in James Bonding's custody. Only then were police apprised of the situation and summoned to the scene.[9] These facts unambiguously establish that James Bonding was performing a private function arising out of its contract with Weaver, and that it acted completely independently and in its own financial self-interest to carry out that function.

Numerous courts in analogous circumstances have held that bail bondsmen are not state actors. *See, e.g., Dean v. Olibas*, 129 F.3d 1001, 1005-06 (8th Cir. 1997); *Landry v. A-Able Bonding, Inc.*, 75 F.3d 200, 204-05 (5th Cir. 1996); *Ouzts v. Maryland Nat'l Ins. Co.*, 505 F.2d 547, 554-55 (9th Cir. 1974); *Green*, 316 F. Supp.2d at 1261-62; *McCoy*, 176 F.R.D. at 681-82. The most critical factor underlying these decisions has typically been "whether the bondsmen enlisted the assistance of law enforcement officers in arresting their principals." *Landry*, 75 F.3d at 204; *see also Brady v. Maasikas*, 2006 WL 1288608, *2 (M.D. Tenn. May 9, 2006) ("when bondsmen unilaterally apprehend their principals without any assistance from law enforcement officials, courts have consistently found them not to be state actors"); *McCoy*, 176 F.R.D. at 682

---

[9] Even then, the evidence before the Court does not support an inference that police officers were called by James Bonding to assist in Weaver's arrest. Instead, the only reasonable inferences supported by the one extant narrative account of that arrest is that the police were called to arrest Weaver's girlfriend and to examine the scene, which had involved an automobile crash, a person being dragged down the street in a fugitive automobile, and the like. Simply put, the police's role was to clean up the mess created by the completed arrest, not to assist, advise or collaborate with James Bonding in carrying out the arrest. The arrest was a *fait accompli* before law enforcement agents ever became involved.

(same). This case unquestionably flunks that litmus test. James Bonding did not request or receive any assistance from law enforcement officers in carrying out the arrest of Weaver. Rather, James Bonding located and arrested Weaver on its own, bringing law enforcement officers into the mix only after the arrest had been concluded and Weaver had been handcuffed and deposited in the back of a James Bonding vehicle. In that regard, this case is factually indistinguishable from *Landry*, in which the Fifth Circuit denied state actor status to a bail bondsman who obtained a warrant from state court for the principal's arrest, arrested the principal without assistance from local law enforcement officials, and did not display the arrest warrant to the principal or anyone else. 75 F.3d at 204-05; *see also Green*, 316 F. Supp.2d at 1261 (bail bondsman is not a state actor where, although his authority to arrest principal derived from the state, he received no instructions, directions, aid, comfort, succor, or anything else from the state in pursuing and capturing principal); *McCoy*, 176 F.R.D. at 681-82 (bondsman is not state actor where he did not enlist aid of law enforcement officers in attempted arrest, but instead acted unilaterally).

To combat these well-reasoned authorities, plaintiff proffers five arguments. First, he characterizes *Landry* and *Green* as holding "that although the bondsmen were in fact 'state actors' they acted for purely personal reasons, and thus, went beyond the authority given to them." (Plaintiff's Supp. Brief, at 2.) This is a misreading of the cases, both of which specifically found that the bail bondsmen at issue were not state actors. *See Landry*, 75 F.3d at 205 ("[w]e find that Burrow and his two employees did not act under color of state law when they seized Landry in Texas and returned him to Louisiana"); *Green*, 316 F. Supp.2d at 1262 ("Since bail bondsmen are not state actors, the Plaintiffs have no cause of action against the Defendants pursuant to 42 U.S.C. § 1983."). Moreover, there is no suggestion in those cases that the bail bondsmen were stripped of state actor status because they exceeded the authority bestowed upon them by the state. Rather, both *Landry* and *Green* explain that the bail bondsmen were not state actors because in executing their state-conferred authority, they acted independently of law enforcement officers, did not purport to be state agents, and did not announce that they were executing arrest warrants on behalf of the state. These facts do not imply that the *Landry* and *Green* plaintiffs exceeded their authority. Therefore, plaintiff's cause

is not furthered by his construction of *Landry* and *Green*.[10]

Second, plaintiff likens this case to *Griffin v. City of Opa-Locka*, 261 F.3d 1295 (11th Cir. 2001), wherein the Eleventh Circuit concluded that a reasonable jury could find that a city manager was acting under color of state law when he sexually assaulted a city employee in her apartment. *Id.* at 1303. In reaching this determination, *Griffin* emphasized the city manager's "persistent abuse of authority leading up to the assault," finding that "the entire pattern of abuse and harassment against Griffin that eventually culminated in her rape is relevant to our color of law analysis." *Id.* at 1305. The *Griffin* court was also swayed by the fact that the city manager had directly used his official authority to create the opportunity to sexually assault his victim. *Id.* at 1305-07 & n.12. Plaintiff reasons that "[i]f Griffin can be held liable, then so should the bondsmen." (Plaintiff's Supp. Brief, at 3.) The Court fails to see any similarity between the fact pattern in *Griffin* and that alleged by plaintiff here. In *Griffin*, the city manager performed his official duties in a manner that facilitated and created opportunities for sexual harassment and sexual assault of his subordinate. But in this case, James Bonding had no official duties or responsibilities to the State of Alabama or the Mobile County Circuit Court. The state court did not order or command James Bonding to apprehend Weaver, but instead simply gave him permission to do so. While the *Griffin* manager was a state actor because he exercised his official state duties in a discriminatory and abusive manner, James Bonding had no official duties, but was acting privately, albeit with the state's permission. Thus, *Griffin* sheds no light on the proper resolution of the state actor query in this case, nor does it in any way suggest that the Eleventh Circuit would construe the "state actor" requirement more expansively in the bail bondsman context than did *Green* and *Landry*.

Third, plaintiff suggests that bail bondsmen can and should be held liable "merely on the grounds that they had to get a [bondsman's process] before arresting the decedent." (Plaintiff's

---

[10]  Plaintiff is correct, however, that the decisions deeming bail bondsmen not to be state actors rest in part on the self-interested motivations for their actions. The Ninth Circuit said it best in pointing out that "the bail bondsman is in the business in order to make money and is not acting out of a high-minded sense of devotion to the administration of justice. ... [T]he bondsman was acting to protect his own private financial interest and not to vindicate the interest of the state." *Ouzts*, 505 F.2d at 555 (citation omitted). This is different from saying that a bail bondsman went beyond his statutory authority.

Supp. Brief, at 3.)  But this is not an accurate summation of the law.  There do not appear to be any cases holding that simply getting a state's permission to act transforms a private party into a state actor for § 1983 liability.  Rather, the undersigned believes that the correct approach on this point is that articulated by the Fifth Circuit, which opined in *Landry* that "mere possession of an arrest warrant does not render a bail bondsman a state actor under § 1983" without more direct involvement of the state in the arrest.  75 F.3d at 205.

Fourth, plaintiff attempts to distinguish *Green* and *Landry* by arguing that James Bonding actually did request the assistance and intervention of local law enforcement officers during the arrest process.  (Plaintiff's Supp. Brief, at 3.)  This distinction is unavailing because, as already discussed *supra*, the evidence is that James Bonding neither requested nor received any assistance from law enforcement until after the arrest of Weaver was concluded.  The post-arrest activities of local law enforcement officers in examining the scene or accepting Weaver into custody at Mobile Metro Jail in no way transform the private character of James Bonding's arrest activities into some official state function in which James Bonding and the State of Alabama were intertwined.  Simply put, the post-arrest events cited by plaintiff have no bearing on the "under color of state law" analysis for § 1983 liability purposes.

Fifth and finally, plaintiff urges this Court to adopt the prevailing approach in the Fourth Circuit, as announced in *Jackson v. Pantazes*, 810 F.2d 426 (4th Cir. 1987).  In *Jackson*, a bail bondsman and a police officer appeared at the home of the bondsman's principal's mother, inquiring as to the principal's whereabouts.  The plaintiff's evidence was that the bondsman forced his way into the home and kicked down interior doors, all as the law enforcement officer physically restrained the mother.  In deeming the bail bondsman a state actor for § 1983 purposes, the *Jackson* court opined that "the symbiotic relationship between bail bondsmen and the Maryland criminal court system suffices to render Pantazes' conduct state action" because bondsmen depend for their livelihood on the state's bail bond system, while the state depends on bondsmen to monitor the whereabouts of released criminal defendants and to retrieve them for trial.  *Id.* at 430.  The Court declines to adopt this portion of *Jackson* for several reasons.  As an initial matter, *Jackson* is a distinctly minority view.  The Fourth Circuit appears to stand alone among appellate courts in finding a symbiotic relationship between a bail bondsman and the

state.[11]  Furthermore, the "symbiotic relationship" aspect of *Jackson* is mere *dicta* because the Fourth Circuit had already concluded in that same opinion that the bail bondsman was rendered a state actor by virtue of the fact that he received significant aid from a police officer in gaining entrance to the home, subduing the owner, and advising the owner that the bail bondsman could do whatever he wanted.  *See Jackson*, 810 F.2d at 429 ("This participation by a state official suffices to render Pantazes a state actor for purposes of § 1983.").  The *Jackson* court having already concluded that the bondsman was a state actor because of the active participation of a law enforcement officer in the challenged incident, it was unnecessary for it to make sweeping pronouncements about the relationship between bail bondsmen and state criminal court systems for § 1983 purposes.  This Court will not embrace the Fourth Circuit's needless *dicta* at the expense of the well-reasoned, persuasive analyses of the Fifth, Ninth and Eighth Circuits.[12]

For all of the foregoing reasons, James Bonding's actions on the evening of August 4, 2003 with respect to Weaver cannot properly be classified as "state action" and cannot expose it to § 1983 liability.  The uncontroverted factual allegations confirm that James Bonding's

---

[11]     *See Landry*, 75 F.3d at 205 n.5 ("We are not persuaded by the Fourth Circuit's finding that the relationship between bail bondsmen and the state criminal court system is such that the actions of the bondsmen may be fairly treated as that of the state itself."); *Dean v. Olibas*, 129 F.3d 1001, 1006 n.4 (8th Cir. 1997) (unequivocally rejecting Fourth Circuit approach, explaining that "bondsmen are private citizens who interact with the state in the course of pursuing their private interests.  Their conduct is therefore not attributable to the state."); *Ouzts*, 505 F.2d at 554-55 (refusing to find that bail bondsman acts as unofficial agent, partner or arm of the State court in bringing fugitives to justice, where state courts have their own official arms for capturing fugitives and bondsman's private reclamation interests and procedures are completely separate from those of the state); *see also Green*, 316 F. Supp.2d at 1260-61 (embracing *Landry* and *Ouzts* rationales, and declining to follow *Jackson*); *McCoy*, 176 F.R.D. at 681 (similar).

[12]     On this point, the Court believes the Eleventh Circuit is likely to agree.  Although the Eleventh Circuit has not considered this precise issue, at least one decision suggests that it would be disinclined to cleave to arguments premised on the notion of a symbiotic relationship between bail bondsmen and the state criminal systems with which they work.  *See Jaffe v. Smith*, 825 F.2d 304m 307-08 (11th Cir. 1987) (finding no governmental action, as necessary to trigger treaty violation, where bail bondsmen forcibly seized plaintiff in Canada and transported him to Florida, on grounds that there was no evidence that bondsmen received instructions, directions, aid, comfort, succor or anything else from federal, state or local governmental agencies).

conduct in arresting Weaver was not fairly attributable to the state and was not performed under color of state law.  Simply put, James Bonding is a private actor which cannot be held liable under § 1983 for bail bonding functions performed unilaterally, without assistance or cooperation from law enforcement agents, and in furtherance of its own private financial and contractual interests.  For these reasons, plaintiff's § 1983 claim against James Bonding is not cognizable as a matter of law, and that cause of action is therefore **dismissed with prejudice**.

### B.    *State Law Claims for Wrongful Death and Assault and Battery.*

In light of the dismissal of the § 1983 claim, there are no federal causes of action in this lawsuit.  Rather, all that remains are state law claims of wrongful death and assault and battery against James Bonding.  The dismissal of all federal claims has important jurisdictional ramifications for this case, where subject matter jurisdiction was predicated exclusively on federal question jurisdiction pursuant to 28 U.S.C. § 1331 and where diversity of citizenship is plainly absent.

Once all triable claims within a federal court's original jurisdiction have been dismissed, the decision of whether to continue to exercise supplemental jurisdiction over the state law claims rests in the court's discretion.  *See* 28 U.S.C. § 1367(c)(2); *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1185 (11th Cir. 2003) (in deciding how to exercise § 1367(c) discretion, court should consider principles of economy, convenience, fairness, and comity); *Palmer v. Hospital Authority of Randolph County*, 22 F.3d 1559, 1569 (11th Cir. 1994) (similar).[13]  The

---

[13]    Judges in this District have routinely declined supplemental jurisdiction in such circumstances.  *See*, *e.g.*, *Hosea v. Langley*, 2006 WL 314454, *34-35 (S.D. Ala. Feb. 8, 2006) (Steele, J.) (declining supplemental jurisdiction over state law claims for conversion and theft after dismissal of all federal claims on the merits); *Powers v. CSX Transp., Inc.*, 188 F. Supp.2d 857, 869 (S.D. Ala. 2002) (Vollmer, J.) (remanding supplemental state law claims after dismissing federal claims on summary judgment); *Bowens v. City of Atmore*, 171 F. Supp.2d 1244, 1260 (S.D. Ala. 2001) (Butler, J.) ("Because all federal claims have been dismissed prior to trial, because state court should be the final arbiter of plaintiffs' tort claims, and because no countervailing considerations outweigh these circumstances, the plaintiffs' state law claims ... will be dismissed without prejudice."); *Brewer v. City of Daphne*, 111 F. Supp.2d 1299, 1320 (S.D. Ala. 1999) (Steele, M.J.) (upon dismissing federal claim on summary judgment, "[t]he Court declines supplemental jurisdiction of the remaining claim for wrongful death under state law in light of the insubstantial nature of the federal claims"); *see also Reynolds v. Golden Corral Corp.*, 106 F.Supp.2d 1243, 1255 (M.D. Ala. 1999) (declining supplemental jurisdiction

Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088-89 (11th Cir. 2004).

This approach is buttressed by the bedrock notion that state courts should generally be the final arbiters of state law claims, particularly when federal claims are dismissed before trial. Indeed, the Supreme Court has declared that:

> "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."

*United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *see also Mergens v. Dreyfoos*, 166 F.3d 1114, 1119 (11th Cir. 1999) (noting that "if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of state claims") (citation omitted); *Baggett v. First Nat. Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997) (indicating that state courts should be final arbiters of state law and that when federal law claims are dismissed prior to trial, remaining state law claims are best resolved by state courts under considerations of judicial economy, fairness, convenience and comity); *Eubanks v. Gerwen*, 40 F.3d 1157, 1162 (11th Cir. 1994) (suggesting that because federal claims were dismissed at summary judgment stage, district court should consider whether interests of comity warrant dismissing state law claim without prejudice).

In light of these authorities and considerations, and in the absence of any argument to the contrary by plaintiff why § 1367 jurisdiction <u>should</u> be exercised, the undersigned will not exercise supplemental jurisdiction here. Accordingly, plaintiff's state law claims against James Bonding for wrongful death and assault and battery are due to be, and the same hereby are, **dismissed without prejudice** for want of federal jurisdiction.[14]

---

over state law claims after granting summary judgment on federal claims).

[14] In so doing, the Court recognizes that the applicable Alabama statute of limitations on these claims appears to have expired. *See* Ala. Code § 6-2-38 (generally providing two-year limitations period for actions sounding in wrongful death or personal injury). Any unfairness to plaintiff from this result is drastically mitigated by the following

**III.    Conclusion.**

For all of the foregoing reasons, plaintiff's federal claims against James Bonding Company are **dismissed with prejudice** on the grounds that defendant is not a "state actor" and cannot be held liable under 42 U.S.C. § 1983 for alleged constitutional deprivations relating to the arrest of plaintiff's decedent.  Plaintiff's state law claims against James Bonding Company are **dismissed without prejudice** for lack of federal subject matter jurisdiction.  A separate judgment will enter.

This ruling disposes of all remaining claims in this action; therefore, the Clerk's Office is directed to close this file.

DONE and ORDERED this 1st day of August, 2006.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

considerations: (i) plaintiff chose to pursue these state law claims in federal court and to initiate that lawsuit just two days before the statute of limitations expired, thereby eliminating his margin for error if the federal court were to decide that § 1367 jurisdiction over the state law claims was inappropriate; (ii) plaintiff's own medical evidence presented in litigating other defendants' motions for summary judgment exposes the profound weakness of his wrongful death claims against James Bonding by establishing that the septic condition that killed Weaver predated and was unrelated to his alleged physical mistreatment by James Bonding on the evening of his arrest; and (iii) plaintiff's assault and battery claims appear destined to fail, inasmuch as Alabama law provides that tort claims for personal injury abate upon a party's death unless such claims were brought before death, *see Price v. Southern Ry. Co.*, 470 So.2d 1125, 1127-28 (Ala. 1985) (tort claim for personal injury abates on death if not filed before death); *Missildine v. City of Montgomery*, 907 F. Supp. 1501, 1504 (M.D. Ala. 1995) (under Alabama law, claim sounding in tort for which no action has been filed dies with the person, and does not survive death in favor of personal representative); Ala. Code § 6-5-462 (providing only that "all personal claims upon which an action has been filed" survive in favor of personal representative).  Given these circumstances, declining supplemental jurisdiction over plaintiff's state law claims can work no injustice.